FILED

2013 SEP 30  PM 1:22

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

| | |
|---|---|
| BRIAN T. SMITH and JONATHAN C. CALIANOS<br><br>Plaintiffs<br><br>vs.<br><br>BANK OF AMERICA, N.A. successor by merger to BAC HOME LOANS SERVICING, L.P. and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.<br><br>Defendants | C.A. No. 2:11-CV-00676-JES-DNF<br><br>**THIRD AMENDED VERIFIED & SWORN COMPLAINT**<br><br>**and**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      Brian T. Smith and Jonathan C. Calianos (collectively the "Plaintiffs")[1] bring this suit as

a last resort and out of utter frustration to get Defendant, Bank of America, N.A. (hereinafter

"BOA") to stop seeking payments under  two promissory notes—one of which is a void

instrument and the other which is a forged instrument.  In the years prior to filing this federal

lawsuit, Plaintiffs "harassed" BOA, repeatedly asking how it could seek any payments from the

---

[1] SmithCal Realty Trust was also a Plaintiff in the initial complaints.  By order dated May 1, 2012, SmithCal Realty trust was dismissed as a party without prejudice.  *See* Document No. 29.

Plaintiffs under a void instrument. [2]  In circular fashion, BOA provided Plaintiffs with many copies of the void note as their sole justification for collection.  Plaintiffs allege that, short of filing suit, BOA would persist in its wrongful actions demanding payments on a void instrument.

2.     Two months after suit was filed, acknowledging that a void instrument is not enforceable, on January 20, 2012, BOA proposed a new theory of why Plaintiffs were responsible for payments—a superseding promissory note.  The superseding note is a blatant forgery in all respects and was never once presented in the years prior to this lawsuit as justification for payment, notwithstanding Plaintiffs' "harassment" of BOA.  BOA does not hold a valid note, nor does it represent a holder of a valid note that would entitle it to payment from the Plaintiffs.  Plaintiffs seek a declaration that neither the Void Note nor the Forged Note, which was produced for the first time defensively in this litigation, is valid or enforceable.  Plaintiffs ask that the Court order BOA to refund all payments wrongfully extracted from the Plaintiffs under the Void Note, plus interest and costs.

3.     On February 10, 2012, Mortgage Electronic Registration System (hereinafter "MERS"), at the sole direction of BOA, assigned its mortgage to BOA.  Because BOA does not hold a valid note (nor does it represent the holder of a valid note), Plaintiffs seek an order directing BOA to release the mortgage it holds on the real property located in Lee County, Florida.  Plaintiffs also contend that Defendants BOA and MERS conspired to engage in a racketeering enterprise in violation of RICO, 18 U.S.C. § 1964(c), and Plaintiffs seek damages on account of such unlawful activity.  Additionally, Plaintiffs allege that: (a) BOA committed fraud by forcing Plaintiffs to make payments on a void instrument by threatening Plaintiffs with

---

[2] The Defendants state in their Motion to Dismiss, Document No. 19: "Moreover, Plaintiffs **harassed BANA and MERS for over three years**..." Doc. 19, p. 19 (emphasis added).  We readily agree that our frequent phone calls and letters pleading for dialogue with the Defendants in the <u>years</u> prior to filing a federal lawsuit can certainly be considered systemic and continued actions which annoyed the Defendants as they did not so much as even want to engage in dialogue on the issue.

financial harm that BOA knew or should have known that it was legally or factually incapable of imparting on the Plaintiffs; (b) Substantial Punitive damages should be imposed against BOA under state law based on BOA's fraudulent, intentional, and wrongful conduct; and (c) Plaintiffs should be awarded damages under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), because BOA, as a furnisher of credit information, intentionally provided inaccurate credit information to all credit reporting agencies regarding the Plaintiffs, in retaliation for being sued by the Plaintiffs.

## JURISDICTION

4. Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because this action is between parties that are citizens of different states and the amount in controversy is greater than $75,000. For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306 (2006). BOA is, on information and belief, a citizen of North Carolina. Plaintiffs are citizens of Massachusetts. MERS is, on information and belief a citizen of Reston, Virginia.

5. Jurisdiction is also proper under 28 U.S.C. §1331, as this action involves questions of federal law. Additionally, this court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 to hear and determine state law claims which are related to federal claims and arise out of a common nucleus of related facts and form part of the same case or controversy. The mortgage that is also the subject of this dispute provides that governing law "shall be federal law and the laws of the jurisdiction in which the property is located." Exhibit B, p. 12.

6. Venue is proper in this Court pursuant to 28 U.S.C. §§1391 (a) & (b) because the subject of this action is real property located at 28111 Tamberine Court, Unit 1321, Bonita Springs, Lee County, Florida, as well as a note and mortgage pertaining exclusively to this property.

## PARTIES

7.      Brian T. Smith is an individual residing at 37 Orchard Street, Upton, Massachusetts 01568.

8.      Jonathan C. Calianos is an individual residing at 116 South Street, Upton, Massachusetts 01568.

9.      Bank of America, N.A. is the successor by merger to BAC Home Loans Servicing, L.P. ("BOA"), a mortgage lender and national bank with headquarters in Charlotte, North Carolina.

10.     Mortgage Electronic Registration Systems, Inc., ("MERS") upon information and belief, is an electronic clearinghouse which was created by mortgage lenders to circumvent the process of recording assignments and paying recording fees to county clerks every time a note and mortgage is bought or sold on the secondary market, and is headquartered in Reston, Virginia.

## FACTS COMMON TO ALL COUNTS

11.     On August 4, 2005, Plaintiffs purchased a condominium at 28111 Tamberine Court, Unit 1321, Bonita Springs, Florida (hereinafter the "Property") for the sum of $399,900.

12.     In order to finance part of the purchase, Plaintiffs obtained a loan in the amount of $240,000 from MLD Mortgage, Inc. ("MLD") and as security, Plaintiffs executed a promissory note in favor of MLD Mortgage, giving MLD a first mortgage on the Property.

13.     Neither the names BOA nor Mortgage Electronic Registration Systems ("MERS") appear in any of the original documents concerning the MLD financing.

14.     Within a month of the original closing, the Plaintiffs were directed to make all future payments to Countrywide Home Loans ("Countrywide"). Plaintiffs never made any payments directly to MLD Mortgage.

4

15.    On or about October 11, 2005, an assignment of mortgage was recorded in the Lee County land evidence records showing that MLD had assigned its mortgage to MERS.

16.    Under the mortgage, "Note" is defined as "the promissory note signed by Borrower and dated August 4, 2005", and "Loan" is defined as: "the debt evidenced by the Note..."  The mortgage secured to the Lender: "(i) repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this security instrument and Note." Exhibit B, Mortgage.

17.    According to the Original Note, the loan was assigned to Countrywide Document Custody Services, a division of Treasury Bank, NA. Subsequently, the note was assigned to Countywide, which endorsed the same in blank. *See* Exhibit A, Page 5.

18.    Plaintiffs made payments to Countrywide until they received the Original August 4, 2005 promissory note back from Countrywide, which had been marked "void."

19.    Plaintiff Calianos is in possession of the original August 4, 2005 Note, and a true and accurate color copy of the Original Note is attached hereto as Exhibit A.

20.    The original August 4, 2005 Note is void. (hereinafter the "Void Note")

21.    Sometime after receiving the Void Note from Countrywide, Plaintiff Calianos began receiving payment requests from BOA.

22.    Calianos contacted BOA by telephone to determine why BOA was seeking payment.

23.    While the Plaintiffs questioned BOA, they continued to pay BOA under protest to ensure their credit remained unblemished, as Plaintiffs relied on their excellent credit to conduct their other daily business transactions.

24.    After many attempts and conversations, BOA indicated that it was seeking payment under a note dated August 4, 2005.

5

25.     When Calianos finally obtained a copy of the note from BOA, Calianos concluded that BOA was seeking to collect on the Void Note.

26.     Calianos asked BOA if they had the original note dated August 4, 2005 in their possession that would entitle them to payments. BOA responded, unequivocally, "yes."

27.     Whenever Calianos asked for a copy of the original note in their possession, BOA sent Calianos a copy of the Void Note, except their copy was not stamped "void," and it did not contain an allonge. Additionally some of the copies sent by BOA contained the following additional information: (1) On each page of the note, the following was printed **"Generated by PDFKit.NET Evaluation"** and "Account No: 104153740"; and (2) Page 1 contained a stamp which stated: "We hereby certify that this is a true and exact copy of the original. By_____ First Title Southwest Florida." On the blank line after "By" appeared the printed initials "RM".

28.     In all other respects, the copies sent by BOA were an exact copy of the Void Note. A true and representative copy of the notes Calianos received from BOA is attached hereto as Exhibit C.

## COUNT  I (DECLARATORY RELIEF)

29.     Plaintiffs incorporate by reference herein, allegations 11-28 above as if set forth herein in full.

30.     In the years prior to filing this lawsuit, Calianos had in excess of 100 written or oral communications with BOA.

31.     Calianos provided BOA many copies of the Void Note in his possession.

32.     BOA was aware that Plaintiffs had the original Void Note in their possession and that Plaintiffs were requesting answers from BOA in the years prior to filing suit and seeking an investigation as to how BOA could seek payment under a void instrument.

33.     In all of the communications prior to this lawsuit, the only basis BOA provided for seeking money from the Plaintiffs was the Void Note.

34.     In a last ditch effort before filing suit, on November 14, 2011, Calianos sent an email to BOA Representative, Ms. Hart, with a draft of the initial Complaint, to illicit some dialogue to explain BOA's actions. BOA never responded to the email.

35.     A void instrument is ineffective and BOA has acknowledged that in this proceeding. *See* Doc. #19, p.2.

36.     The Plaintiffs paid in excess of $60,000.00 under protest to BOA under the Void Note.

37.     The only way Plaintiffs could question BOA's wrongful conduct in seeking payments under a void instrument was by filing this lawsuit.

38.     When faced with the reality of having to explain their wrongful conduct in a federal court, BOA proposed a new theory to present as a defense in this proceeding.

39.     On January 20, 2012, while operating under a second consensual extension of the deadline to answer the Complaint, counsel to BOA, Nathan Taylor, Esq., emailed Plaintiffs a poor PDF copy of a NEW Promissory Note, explaining that he had just discovered the document, and that this "new" note is the document that obligates the Plaintiffs to make payments to BOA, and suggested Plaintiffs should dismiss their lawsuit. *See* Exhibit D.

40.     Taylor stated that he possessed a "wet copy" which was signed in "green ink." *Id.*

41.     Prior to January 20, 2012, BOA never provided Plaintiffs with a copy of the "new" Promissory Note as a basis for collecting any money from the Plaintiffs, notwithstanding

communications numbering in excess of 100 on the subject in the years prior to the lawsuit. *See* Exhibit D.

42.     Prior to January 20, 2012, the Plaintiffs had never seen or hear about a "new" Promissory Note.

43.     On September 26, 2012, BOA finally produced a legible, color copy of the "new" Promissory Note, only after many prior requests.

44.     A color copy of the note provided to Plaintiffs by BOA on September 26, 2012 is attached hereto as Exhibit E and will be referred to as the Forged Note.

45.     A cursory review of the Forged Note reveals that it contains some distinct differences from the Void Note in the following respects: The Forged Note is on 8.5 x 11 inch paper whereas the Void Note is on 8.5 x 14 inch paper; the Forged Note is executed in green ink whereas the Void Note is executed in black ink; page 1 of the Forged Note contains a large handwritten number in the upper right hand corner and a large bar code on the bottom right corner whereas the Void Note contains none of these marking; page 5 of the Forged Note contains a large paragraph of type-written verbiage after the signature lines and page 5 of the Void Note does not have that paragraph, but rather a handwritten paragraph above the signature lines; and the Forged Note consists of 6 pages whereas the Void Note is 5 pages in total. *Compare* Exhibits A & E.

46.     The Plaintiffs have never signed any legal document in green ink.

47.     Calianos did not place his signature or initials on the Forged Note.

48.     Smith did not place his signature or initials on the Forged Note.

49.     Calianos never prints his initials "JCC" as contained on the Forged Note; rather, he signs in script "JC" and the initials on the Forged Note are not Calianos' initials.

50.     While Smith does initial "BTS", all three letters of Smith's initials on the Forged Note are not Smith's initials.

51.     Calianos' signature on the Forged Note is not genuine because: the "J" in Jonathan is not right and the "onath" appears too squished. The spacing between Jonathan's first name and his middle initial is too narrow, and there does not appear to be a period after his middle initial, which Calianos' always does. Calianos' last name lacks definition and a dot on the "i" appears missing.

52.     Smith's purported signature on the Forged Note is not genuine because: the "B" and "R" in "Brian" are connected, which Smith never does, and the B is not the way Smith writes his B. The middle initial "T" and the "S" in "Smith" also are not even reasonable replica of the way Smith signs his name.

53.     The Defendants BOA & MERS engaged handwriting expert F. Harley Norwitch ("Norwitch") to examine and opine on the genuineness of the questioned signatures. *See* Norwitch Report, Exhibit F.

54.     Norwitch cannot determine whether Calianos signed the Forged Note, and his conclusions regarding Smith's signature contain scant analysis of the purported signature which is of little value. *Id.* at p. 4. Norwitch states that because Smith's signature does not contain any shakiness or hesitations, and it looks pretty close, it must be genuine. *Id.* Norwitch fails to evaluate a key component of the Forged Note— the initials appearing on each page— and none of his conclusions are made to any degree of scientific certainty. *Id.*

55.     The Plaintiffs hired handwriting expert Dr. Marc J. Seifer ("Seifer") to evaluate the questioned signatures and initials on the Forged Note. *See* Seifer Report, Exhibit G.

56.     Seifer concludes to a reasonable degree of scientific certainty that the signatures and the initials appearing on the Forged Note were not placed there by the Plaintiffs and that the questioned signatures and initials are forgeries. *Id.*

57.     Defendants' counsel, Taylor, has unabashedly stated to Plaintiffs: "banks <u>routinely</u> present forged instruments for payment." *See* Exhibit H (emphasis added).

58.     BOA has also admitted to presenting forged instruments for payment in other instances.

59.     Federal National Home Mortgage Association, a/k/a "Fannie Mae" is the current holder of the forged instrument.

60.     There have been many other reported instances where Fannie Mae has purchased loans from Countrywide that contained forged documents.

61.     The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). In seeking declaratory relief, a plaintiff must satisfy a two part test demonstrating that a declaratory judgment is appropriate. *See Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005). The Court must initially decide whether an actual case or controversy exists; then it must determine whether to exercise its jurisdiction to grant the relief requested. *Id.* To warrant a declaratory judgment, there must be a substantial, actual controversy between the parties. *See Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). In *Principal Life Insurance*, the Court of Appeals for the Ninth Circuit found declaratory relief appropriate in a private contract dispute stating: "the only possible harm to Principal, both now *and in 2008*, is possible financial uncertainty and loss. To escape this predicament, Principal's only potential remedy is to bring an

action for declaratory relief. Indeed, this is precisely the type of case for which declaratory relief is appropriate." 394 F.3d at 671.

62.    It is axiomatic that in order to enforce the terms of a note, the lender seeking enforcement must first be a holder of a valid instrument. *See Troupe v. Redner*, 652 So. 2d 394 (Fla. 2d DCA 1995); Fla. Stat. § 673.3011.

63.    A forged signature on a negotiable instrument is ineffective and not enforceable. *See* FLA STAT 673.4031(1) & 671.201(44).

64.    Given the undisputed facts surrounding the Forged Note and the Defendants' shocking admission that forgery has become an accepted practice in the mortgage industry, and considering the unsupported conclusions of their own expert regarding the validity of the signatures on the Forged Note, BOA cannot meet its burden under FLA. STAT. § 673.3081(1) in establishing the validity of the signatures on the Forged Note.

65.    Until January 20, 2012, the only justification BOA provided for collection of any money from Plaintiffs was the Void Note, and after January 20, 2012 and during the pendency of this litigation, BOA now seeks collection of money from the Plaintiffs under a Forged Note.

66.    BOA has no legal right to collect any money from the Plaintiffs, and in order to prevent further financial uncertainty and loss to the Plaintiffs, declaratory judgment is warranted.

WHEREFORE Plaintiffs ask this Honorable Court to declare that the Void Note in Plaintiffs' possession is void and ineffective. Additionally, Plaintiffs seek a declaration that the Forged Note in Fannie Mae's possession is a forgery and ineffective. Because BOA holds neither a valid note nor represents the holder of such a note, Plaintiffs also seek an order requiring BOA to release and discharge the mortgage it holds on the Property. Because BOA wrongfully extracted payments from the Plaintiffs under the Void Note, Plaintiffs seek an order against BOA requiring

it to refund all sums paid to BOA under the Void Note, plus interest. Plaintiffs seek any other relief that this Honorable Court deems just and reasonable.

### COUNT  II  (Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b))

67.     Plaintiffs incorporate by reference allegations 11-28 as if set forth herein in full.

68.     Under the FCRA, a private right exists against a "furnisher of information" where the plaintiff demonstrates that a furnisher has failed to comply with 15 U.S.C. § 1681s-2(b).  *See Lofton-Taylor v. Verizon Wireless*, No. 05-0532-CG-B, 2006 WL 3333759, at *5 (S.D. Ala. 2006).

69.     After receiving notice from a consumer reporting agency that the information provided is disputed, the furnisher of the information is required to (a) conduct a reasonable investigation concerning the disputed information: (b) review all relevant information provided by the agency; (c) report the results of its investigation to the consumer reporting agency; and (d) correct any item of information found to be incomplete or inaccurate. *See* 15 U.S.C. §1681s-2(b)(1).

70.     If a furnisher of consumer information negligently fails to comply with its duties under section 1681s-2(b), the consumer may recover actual damages plus costs and attorney's fees. *See* 15 U.S.C. §1681o. If the furnisher of the consumer information willfully fails to comply with its duties under  1681s-2(b), the consumer may also recover punitive damages in "such amount... as the court may allow." 15 U.S.C. §1681n.

71.     BOA is a furnisher of credit information.

72.     Plaintiffs are consumers.

73.     On January 13, 2012, after being served with the Complaint and obtaining a consensual extension of the Answer deadline, and having full knowledge that the validity of the underlying debt was seriously contested, BOA reported Plaintiffs 30 days past due to all credit reporting

agencies for their December 2011 payment and January 2012 payment. Exhibit I, BOA's Responses to Plaintiffs' Request for Admissions, p. 4, Request Nos. 15 & 16.

74.     When BOA made the adverse credit reporting on January 13, 2012, there was no possible way Plaintiffs could be considered late for the January 2012 payment, as the fifteen day grace period for any such payment had not yet even expired.

75.     Because the Forged Note was not discovered until January 20, 2012, the only basis for the negative credit reporting by BOA had to be the Void Note.

76.     Prior to December 2011, Calianos made all payments demanded by BOA, but under protest.

77.     On January 26, 2012, Calianos sent Attorney Taylor an email asking that the status quo be maintained during litigation, with BOA reversing any negative credit reporting. Exhibit J, Email String.

78.     Calianos suggested that the parties establish a joint escrow account for future disputed payments, and any release of the funds from escrow would require the signature of both parties. *Id.*

79.     Taylor refused the request. *Id.*

80.     The negative reporting for December 2011 and January 2012 remains on Plaintiffs' credit reports.

81.     On February 15, 2012, Calianos sent a letter to Experian, TransUnion, and Equifax (hereinafter collectively as "Consumer Reporting Agencies"), explaining the dispute and asking the Consumer Reporting Agencies to reverse the negative credit report during the pendency of the litigation. *See* Exhibit K.

82.     Experian, TransUnion and Equifax each notified BOA of Calianos' dispute regarding BOA's negative credit reporting.

83.     After receiving the notice of the dispute from the Consumer Reporting Agencies, BOA willfully failed to conduct any investigation as required under 15 U.S.C. §1681s-2(b)(1)(A).

84.     When BOA received the Notice from the Consumer Reporting Agencies regarding these disputes, it knew Calianos may not be obligated on any debt owing to BOA, and under no circumstance could the alleged payment due for January 2012 be deemed late as of January 13, 2012, because the grace period for such payment would not expire until after January 15, 2012.

85.     BOA clearly understands that if it is not a creditor of Calianos, it has no right to make adverse credit remarks concerning his credit to Consumer Reporting Agencies.

86.     This understanding is demonstrated by the fact that BOA made no further adverse credit remarks after January 13, 2012, notwithstanding the fact that Plaintiffs stopped making all disputed payments to BOA in December 2011.

87.     Had BOA even made a cursory review of the notice it received from the Consumer Reporting Agencies, it would have known that the two adverse credit remarks made on Calianos' credit reports immediately after the lawsuit was filed needed to be expunged from the reports.

88.     BOA's actions were willful and were specifically done in retaliation for Calianos filing the complaint in this matter.

89.     BOA's refusal to enter into the proposed escrow agreement pending the outcome of this litigation is further evidence of BOA's malicious intent to punish the Calianos for filing a federal lawsuit and its willful failure to conduct any investigation.

90.     Prior to January 13, 2012, Calianos had exceptional credit and has never been denied credit for any reason.

91.     Calianos has sustained damages on account of BOA's actions in that he has been denied credit in attempt to refinance his home to a lower interest rate, he has paid more for some credit he could obtain, he has had insurance policies cancelled on homes, automobiles, and a boat, and he has had to pay higher premiums for some insurance products.  Calianos has also suffered emotional distress over these major life disruptions, he has lost sleep, he has been nauseous, and he has been angry and frustrated by these events.

92.     On June 25, 2012, Smith sent a letter to Experian, TransUnion, and Equifax, explaining the dispute and asking the Consumer Reporting Agencies to reverse the negative credit report during the pendency of the litigation. *See* Exhibit L.

93.     Experian, TransUnion and Equifax each notified BOA of Smith's dispute regarding BOA's negative credit reporting.

94.     After receiving the notice of the dispute from the Consumer Reporting Agencies, BOA willfully failed to conduct any investigation as required under 15 U.S.C. §1681s-2(b)(1)(A).

95.     When BOA received the Notice from the Consumer Reporting Agencies regarding these disputes, it knew Smith may not be obligated on any debt owing to BOA, and under no circumstance could the alleged payment due for January 2012 be deemed late as of January 13, 2012, because the grace period for such payment would not expire until after January 15, 2012.

96.     BOA clearly understands that if it is not Smith's creditor, it has no right to make adverse credit remarks concerning his credit to Consumer Reporting Agencies.

97.     This understanding is demonstrated by the fact that BOA made no further adverse credit remarks after January 13, 2012, notwithstanding the fact that Plaintiffs stopped making all disputed payments to BOA in December 2011.

98.    Had BOA even made a cursory review of the notice it received from the Consumer Reporting Agencies, it would have known that the two adverse credit remarks made on Smith's credit reports immediately after the lawsuit was filed needed to be expunged from the reports.

99.    BOA's actions were willful and were specifically done in retaliation for Smith's filing of the complaint in this matter.

100.   BOA's refusal to enter into the proposed escrow agreement pending the outcome of this litigation is further evidence of BOA's malicious intent to punish the Smith for filing a federal lawsuit and its willful failure to conduct any investigation.

101.   Prior to January 13, 2012, Smith had exceptional credit and he has never been denied credit for any reason.

102.   Smith has sustained damages on account of BOA's actions in that he has been denied credit in total.  Smith relies heavily on credit in his small business and he was unable to obtain new credit from vendors, often having to buy stock on a cash basis.  Smith has also suffered emotional distress over these major life disruptions, he has lost sleep, he has been nauseous, and he has been angry and frustrated by these events. The additional financial stress occasioned by the negative credit reporting has also caused distance and discord in Smith's marital relationship.

103.   Because BOA's actions in failing to comply with its duties under section 1681s-2(b) are willful and done in retaliation for Plaintiffs filing of the initial complaint in this matter, punitive damages are warranted.   In assessing punitive damages against BOA for their intentional misconduct, the actual measure of damages should consider that BOA serves one in every two households in America and operates in more than 40 countries, with nearly 300,000 employees worldwide, and had a net worth in 2010 of at least $300 billion.  Additionally the court should consider the willful misconduct and overreaching of which BOA has been accused recently and

how BOA continues to act in a reprehensible manner, notwithstanding the billions of dollars it has already paid on account of its aberrant behavior. According to published reports of recent BOA settlements, on December 7, 2010, BOA paid $137.3M in restitution to federal and state agencies for its participation in a conspiracy to rig bids in the municipal bond derivatives market. BOA participated in bid rigging and other deceptive practices that harmed municipalities and school districts. On December 21, 2011, BOA paid $335M to resolve allegations that it engaged in a wide spread pattern to discriminate against African- American and Hispanic borrowers on home loans. On April 26, 2012, BOA paid $2 Billion (part of a larger $25 Billion settlement) to settle allegations of loan servicing and foreclosure abuses. On May 26, 2011, BOA paid in excess of $20M to settle allegations that it wrongfully foreclosed on homes belonging to American military personnel serving in Iraq and Afghanistan. On September 13, 2012, BOA settled allegations that they violated the Fair Housing Act (by discriminating against borrowers on the basis of disability) and the Equal Credit Opportunity Act (by discriminating against borrowers on the basis of the receipt of public assistance). The penalty here needs to be of sufficient magnitude to ensure that BOA gets the message that it will not profit from the abuse of power against its own customers.

WHEREFORE Plaintiffs ask this Honorable Court to award them their actual damages under the FCRA caused by BOA's intentional breach of its duties under the statute, award them costs and attorney fees, and award the Plaintiffs punitive damages under 15 U.S.C. § 1681n in a sum sufficient to punish and deter BOA from engaging in such intentional and unlawful behavior in the future. Plaintiffs further ask that any award of punitive damages be ordered payable as follows: 50% to the Plaintiffs and 50% to the National Consumer Law Center in order to assist

others who may be facing similar issues but are without sufficient resources to obtain the relief required.

## COUNT III (FRAUD)

104.    Plaintiffs incorporate by reference herein allegations 11-28 above as if set forth herein in full.

105.    In the years prior to filing this lawsuit, Calianos had either written or oral communications with BOA on more than 100 occasions.

106.    In the majority of these conversations, Calianos repeatedly asked BOA how it could force the Plaintiffs to pay under a promissory note that was void.

107.    BOA routinely stated that it had the original promissory note dated August 4, 2005 "in its file", and that if Plaintiffs did not make timely payment, "BOA would commence foreclosure proceedings, report delinquent and late payments to credit bureaus, and charge late fees and other charges."

108.    Calianos asked representatives whether they actually looked in their file, and BOA responded "yes" and referred to the certification by RM on the copy of the notes mailed to Plaintiffs. *See* Exhibit C.

109.    The note containing the certification of RM was virtually identical to the Void Note, and BOA knew this fact.

110.    BOA's records produced in discovery show that it had a copy of the Void Note provided by Plaintiffs and knew there was serious question whether the copy BOA was relying on "in its file" was legally enforceable.  One notation states: "Would someone in your area be able to contact this mortgagor?  This could be a debt elimination issue as the mortgagor claims that

Bank of America does not have the legal obligation to collect under the Note." Exhibit M.

Another states:

> Homeowner is stating that BAC does not hold legal obligations to collect on the loan due to the fact he claims to hold the original note. The homeowner has already now talked with 3 managers whom advise that they would contact him back and the notes only advised that they forwarded the request to legal dept. When we send him a copy of the note on file he advises that it is not the original. Homeowner is demanding action on this account.

*Id.*

111.   Notwithstanding its knowledge that it was collecting on a Void Note, BOA continued to press Plaintiffs month after month for payment and threatened economic harm to Plaintiffs if they failed to comply.

112.   Each month before making payment, Plaintiff Calianos would call BOA to see whether they came to their senses, and when he heard the same threats of economic harm in the event of non-payment, Plaintiffs made the payments under duress.

113.   Plaintiff Calianos occasionally took notes during his conversations with BOA representatives and can document conversations with the following BOA representatives: Hyda ext 8152, Jeanette Gutierez, Ieisha, Danielle ext 5245, Camile ext.9150, Briana inbound call center, Jennifer, Rick Olivera, Angie, Tenisha Hamilton, Mahlon, Adam Morrison, Loris MERS/BOA, Jody DiMarcello, Christine West, Thuy Tran, Tasha, Tracy, Leon 0119, Jonathan Wathola, and Steve.

114.   Each of these conversations were similar in substance to those described in Paragraphs 106-109 hereof.

115.   On at least two occasions, Plaintiffs paid BOA late, once intentionally out of frustration and once due to bank error.

116.   On both occasions, Plaintiffs were immediately charged a late fee and began receiving collection calls from BOA.  During the phone calls, BOA threatened to make adverse reports to credit reporting agencies, commence foreclosure proceedings, and charge late fees if payment was not immediately forthcoming.

117.   On one occasion believed to be August 31, 2011, the BOA representative "Mahlon" asked Plaintiff Calianos if the Property was occupied.   When Calianos refused to answer, Mahlon stated that "if you don't tell me whether it is occupied, I will order a property inspection which you will be required to pay for."  As a result of the additional threats, Calianos complied with Mahlon's demand to answer his question and Plaintiffs made the payments demanded by BOA.

118.   The elements of fraud under Florida law are:

(1) a false statement concerning a material fact;
(2) the representor's knowledge that the representation is false;
(3) an intention that the representation induce another to act on it; and
(4) consequent injury by the party acting in reliance on the representation.

*Golden v. Mobile Oil Co.*, 882 F.2d 490, 494 (11th Cir. 1989) (citations omitted).

119.   BOA's statements that in the event of non-payment by the Plaintiffs, it could make negative reports to credit reporting agencies, commence foreclosure proceedings, conduct property inspections, and charge late fees were all false statements of material fact.

120.   BOA knew the statements in Paragraph 119 were false because it only justified its actions by reference to a copy of the Void Note in its file, and as such, it had no legal right to do any of the actions contained in the statements set forth in Paragraph 119.

121.   BOA made the false statements in Paragraph 119 for the sole purpose of inducing Plaintiffs to make payments under the Void Note.

122.    Plaintiffs reasonably relied on the false statements made by BOA each month and continued to make payments under the Void Note each month until the initial complaint was filed on November 30, 2012.

123.    Plaintiffs were damaged by BOA's wrongful conduct in that they were forced to make payments to BOA in excess of $60,000.00 under the Void Note.   Additionally, every time Plaintiff Calianos spoke to BOA regarding collection under the Void Note, or was required to make a monthly payment under the Void Note, Calianos became frustrated, angry, felt sick to his stomach, and suffered emotional distress.

124.    Under Florida law, a defendant is liable for punitive damage when:

> the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence. As used in this section, the term:
>
> (a) "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.
>
> (b) "Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

Fla. Stat. §768.72.

125.    BOA's intentional and fraudulent conduct in collecting on a promissory note that it knows is void,  and threatening Plaintiffs with economic harm if Plaintiffs failed to make the unlawful payments, and refusing to discuss the matter with the Plaintiffs in the years prior to suit, and forcing the Plaintiffs to litigate this matter in order to obtain relief from the unlawful conduct, constitutes intentional misconduct.

126.   The Plaintiffs alerted BOA early on, and almost monthly, that their conduct was unlawful.

127.   The Plaintiffs alerted BOA almost monthly that their unlawful conduct was causing Plaintiffs severe financial and emotional distress.

128.   BOA had actual knowledge of the wrongfulness of its conduct and it knew there was a high probability that the Plaintiffs would be injured or damaged as a result.

129.   Despite this knowledge, BOA ignored the Plaintiffs and continued to engage in the intentional and unlawful conduct month after month which caused serious financial and emotional injury to the Plaintiffs.

130.   Additionally, BOA's conduct can be deemed grossly negligent because its conduct was so reckless or wanting in care that it constitutes a conscious disregard or indifference to the rights of the Plaintiffs.

131.   A cursory review of its file would have revealed that their (successful) attempts to collect money from the Plaintiffs under a void instrument were misguided and unlawful.

132.   Rather than conducting a review or getting their in-house legal team involved, BOA used its position of power to ignore the Plaintiffs and make the repeated unlawful threats that caused the Plaintiffs financial damage and serious emotional injury.

133.   BOA intentionally engaged in conduct to harm the Plaintiffs, and the Plaintiffs were harmed by such conduct. As such, the $2 million cap on punitive damages should not apply in this matter. *See* Fla. Stat.§768.73.

134.   In assessing punitive damages against BOA for their intentional misconduct, the actual measure of damages should consider that BOA serves one in every two households in America and conducts business in more than 40 countries, with nearly 300,000 employees worldwide, and

had a net worth in 2010 of at least $300 billion. The penalty here needs to be of sufficient magnitude to ensure this financial titan understands the wrongfulness of its conduct and will not be tempted to act in a similar fashion down the road.

WHEREFORE Plaintiffs ask this Honorable Court to award them damages on account of BOA's fraud, including but not limited to, a refund of all sums paid to BOA plus interest under the Void Note, and damages for the emotional and physical distress caused to Plaintiffs by forcing them under the threat of economic harm, to pay on a Void Note, and to award any other relief that this Honorable Court deems just and reasonable. Plaintiffs also ask this Honorable Court to award them punitive damages under Fla. Stat. §768.73(c) in a sum sufficient to punish and deter BOA from engaging in such intentional, unlawful behavior in the future. Plaintiffs further ask that any award of punitive damages be ordered payable as follows: 50% to the Plaintiffs and 50% to the National Consumer Law Center in order to assist others who may be facing similar issues but are without sufficient resources to obtain appropriate relief.

## COUNT IV (Civil RICO 18 U.S.C. § 1964(c))

135.    Plaintiffs incorporate herein by reference allegations 11-28 and 105-117 above as if set forth herein in full.

136.    MERS is a bankruptcy remote entity, intentionally established with no employees and no assets—essentially an empty shell that is controlled by its member lenders. *See* Deposition of William Hultman, Secretary & Treasurer of MERS, April 7, 2010, pp. 30-34 & 69, taken in the case of Bank of New York v. Ukpe, Docket No. F-10209-08, Superior Court of New Jersey, Atlantic County and available at: http://www.scribd.com/doc/36521121/Full-Deposition-of-William-Hultman-Secretary-and-Treasurer-of-MERSCORP.

137.    BOA is a member of MERS and MERS only acts at the direction of its members. The members are required to update and inform the MERS system of any assignments of notes and mortgages. *Id.* at 126.

138.    In early 2011, Calianos contacted Lawrence Terrado at MERS as holder of the mortgage, to alert MERS that Plaintiffs held the original note in this matter which had been endorsed in blank, marked void, and returned to Plaintiffs. Plaintiffs asked MERS to either assign the mortgage to Plaintiffs or discharge the same, as it constituted an invalid cloud on title.

139.    Plaintiffs forwarded both the Void Note (Exhibit A) and BOA's copy of the Void Note (Exhibit C) to Mr. Terrado, and Plaintiffs were assigned case number 99238927.

140.    In September 2011, Plaintiff Calianos heard back from Loris who identified herself as a "BOA/MERS Representative."

141.    It was unclear whether Loris worked for BOA or MERS, or both entities.

142.    Calianos inquired of Loris how a mortgage can secure a void note.

143.    Loris stated she understood the problem regarding the Void Note, but MERS may only act at the direction of BOA in this matter, and BOA had provided no direction.

144.    Loris also indicated that she attempted to escalate the matter to BOA's Legal Department, but the Legal Department declined to get involved without a pending foreclosure.

145.    MERS controlled the only tool-- the mortgage-- that allowed BOA to carry out its threatened economic harm against the plaintiffs. BOA threatened plaintiffs with economic harm (foreclosure and loss of the Property) if they did not make payments under the Void Note. The only tool available to BOA to accomplish foreclosure on the Void Note was the mortgage being held by MERS. MERS only takes instruction from its members like BOA, and upon request, MERS assigns the mortgage to the member.

146.    On February 10, 2012, with no enforceable note in its possession, MERS transferred the mortgage on the Property to BOA.

147.    Federal RICO statutes allow persons injured in their business or property to collect treble civil damages for activities that are usually considered criminal in nature.  The statute provides in relevant part: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee... ." 18 U.S.C. § 1964(c).  In turn, section 1962(a) provides:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C.§ 1962(a).  Therefore, in order to succeed on a civil RICO claim, the Plaintiff "must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima SPRL v. Imrex Co. Inc.*, 473 U.S. 479, 496 (1985).

148.    "Enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  Both BOA and MERS are corporations and satisfy the definition of an Enterprise, as the illegal acts threatened by BOA (foreclosure & property inspection fees) against the Plaintiffs could not have been completed without the participation of both parties.

149.    Critical to Plaintiffs' civil RICO claim is the requirement that they establish that the actions of BOA and MERS in forcing the Plaintiffs to make payments under the threat of economic harm, on a promissory note that BOA and MERS knew was void,

constitutes conduct that is outlawed by one of the predicate criminal acts which RICO defines as racketeering activity and are expressly enumerated in 18 U.S.C. § 1961(1)(B).

150.   Plaintiffs contend that the Defendants' conduct described herein satisfies the predicate criminal acts of mail fraud,18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.

151.   <u>Mail Fraud- 18 U.S.C. §1341</u>:

> Mail fraud ... occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." §1341. The gravamen of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element," *Schmuck* v. *United States*, 489 U. S. 705, 712 (1989) (citation and internal quotation marks omitted), even if the mailing itself "contain[s] no false information," *id.*, at 715.

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 647 (2008).

152.   BOA & MERS were involved in a scheme to collect payments from Plaintiffs on a promissory note they knew BOA: (1) did not hold, and (2) was void in any event.

153.   When Plaintiffs sent BOA and MERS copies of the Void Note, BOA and MERS, at a minimum, had concurrent obligations to conduct a reasonable investigation into the status of the Void Note.

154.   Any review of BOA and MERS files would have revealed that they could not hold the original copy of the Void Note, as that was in Plaintiffs' possession.

155.   Instead, BOA and MERS made continuous, numerous misrepresentations to the Plaintiffs using both mail and wire, indicating that "they held the original copy" of the Void Note "in the file" and they forced Plaintiffs to continue paying under the Void Note under the threat of economic harm including threats of foreclosure, adverse credit reporting to credit reporting agencies, and the imposition of late fees and other costs.

156.   BOA and MERS utilized the U.S. mail to further the misrepresentation and to wrongfully force the Plaintiffs to continue making payments under the Void Note.

157.   Such mailings included monthly billing statements from BOA requiring Plaintiffs to pay a "minimum monthly payment" by the 15th of the month or be subject to additional late fees. Such mailings exceed 100 in the years prior to suit and have continued through today.

158.   Other mailings include correspondence mailed to Plaintiffs wherein BOA, attached a copy of the Void Note (Exhibit C), and stated to Plaintiffs, both by mail and wire, that this copy "was a true representation of the original note contained in its file." BOA bolstered its false statement by referring to the certification of "RM" on its copy. BOA had to know that this certification was false at the time it was made, yet it was included in the mailings to further its scheme of misrepresentation. Such mailings were sent to Plaintiffs at least on three occasions in the last 2 years.

159.   Each of these mailings constitutes an act of mail fraud, and together they constitute a pattern of racketeering activity under RICO.

160.   Wire Fraud- 18 U.S.C. §1343:  The requirements of wire fraud are essentially similar to mail fraud except that to satisfy the wire fraud statute, the defendants must utilize wire in interstate commerce, such as telephone, to execute their scheme to defraud Plaintiffs. *Compare* 18 U.S.C. §1341 with 18 U.S.C. §1343.

161.   BOA and MERS utilized the telephone in interstate commerce to further the misrepresentations and wrongfully forced the Plaintiffs to continue making payments under the Void Note.

162.   The substance of these phone conversations is contained in Paragraphs 96-107 and 128-134. In each of these phone conversations, the Defendant BOA made false representations that it

holds the original copy of the Void Note and that if Plaintiffs failed to pay under the Void Note, BOA would commence foreclosure proceedings, charge late fees, charge property inspection fees, and report Plaintiffs delinquent to credit reporting bureaus.  These phone conversations number in excess of 20 in the last 3 years and have continued through October 2011.

163.    Each of these telephone conversations constitutes an act of wire fraud, and together they constitute a pattern of racketeering activity under RICO.

164.    As a result of this fraudulent scheme of BOA and MERS, Plaintiffs were injured in their business or property by having to make unlawful payments in excess of $60,000.00 to BOA, under the specific threat of economic harm.  Additionally, Plaintiffs have been unable to sell the Property in a declining market or obtain any credit on the Property.

WHEREFORE Plaintiffs ask this Honorable Court to award them treble damages, their costs of suit, and reasonable attorney's fees under 18 U.S.C. §1864(c) and any other relief that this Honorable Court deems just and reasonable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts which such right is afforded by law.

The Plaintiffs hereby declare that the foregoing Third Amended Complaint is signed under the pains and penalties of perjury, this 27 day of September, 2013.

Respectfully submitted this _27th_ day of September, 2013,


Plaintiff, Brian T. Smith



Plaintiff, Jonathan C. Calianos



116 South Street
Upton, MA 01568
Email: jcalianos@usa.net
Tel: 617-899-0576
Fax: 508-529-1200


## CERTIFICATE OF SERVICE

I hereby certify on this _27th_ day of September, 2013, I furnished a copy of this document

via email, pursuant to the parties' agreement concerning service of documents, to the

Defendants, through their counsel at the following addresses: erottmann@mcguirewoods.com;

NJohnson@mcguirewoods.com; aabbott@mcguirewoods.com; and

sfhollad@mcguirewoods.com.



Jonathan C. Calianos

29